Argued May 1, 1939.
The vital question involved in this appeal is whether a borough which supplies water to its inhabitants from its own water plant, and in connection therewith furnishes water to consumers outside the borough, residing or doing business in a township abutting thereon, (1) may establish a rate schedule for the consumers in the township different from that used in the borough, based upon the specific investment in the township and the allocation of a proper proportion of general plant investment, in arriving at the rate base, and a similar division and allocation of operating, maintenance and depreciation charges; or (2) may be required by the Public Utility Commission to treat the customers outside the borough as if the whole plant were that of a *Page 53 
private water company, and make no segregation of consumers outside the borough for rate making purposes. The appellant borough takes the first position; the commission and the intervening appellees — the complainants against the rate schedule filed by the borough — take the second. We all agree that the borough's contention is correct.
The Public Service Company Act of 1913, P.L. 1374, gave the Public Service Commission no power of supervision or regulation over the rates charged by a municipal corporation which furnished water or other public service to its inhabitants or to customers residing outside its limits. But the Public Utility Law of May 28, 1937, P.L. 1053, in section 301, 66 PS Supp. sec. 1141, provides: "That any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits, shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service [that is, the service beyond its corporate limits] were rendered by a public utility."[1]
It was on this section of the Act that the commission based its contention that it could require the borough to file a schedule of rates for customers outside the borough which made no segregation or allocation of *Page 54 
investment, operating and maintenance expenses, etc., between customers inside and outside the borough, but treated the whole as one operating private utility in arriving at the rates to be charged outside customers. But this overlooks the fact that the provision giving the commission any authority to regulate and control the rates for public service furnished or rendered by a borough restricts it to "any public utility service furnished or rendered . . . . . . beyond its corporate limits." The contention of the commission, if sustained, would have the effect of arrogating to it the authority to determine the fair and reasonble rates for public service within the borough's corporate limits, even though it had no power to enforce them. In our opinion the statute gives it neither, but only the right to regulate and control the rates for public service furnished beyond the borough's corporate limits, in accordance with the principles laid down for public utilities,[2] that is, the rates must be fair and reasonable, and based on the fair value of the property used and useful in the public service furnished outside the borough limits, with a just and reasonable allocation of a fair proportion of the general plant investment within the borough, which is necessary for rendering the service without its limits, and also a fair allocation of the operating, maintenance and depreciation charges.
In the present case the commission had no fault to find with the borough's allocation of the proportion of general plant investment, charges and expenses, etc. within the borough properly chargeable to the service furnished customers outside the borough. It rejected entirely the contention of the complainants, in this respect, saying: "We consider that the position of the *Page 55 
township is arbitrary and wholly untenable. It absolutely ignores actual use of facilities and allocates on an arbitrary basis. If allocation were to be made, we would be inclined to accept the basis submitted by respondent. Such basis recognizes actual use of facilities and what appears to us to be a reasonable proportion of facilities jointly used."
It sustained the complaint solely because it was of opinion that "the provisions of Section 301 of Article III of the Public Utility Law indicates that the proper rates for service in Harmony Township should be determined by considering the water works and service as a whole, rather than only those parts of the plant and the service which are in or may be allocated to Harmony Township. This method of approach will be employed in determining the justice and reasonableness of the proposed rates. However, only the rates applicable to service in Harmony Township are under the jurisdiction of the Commission."
Counsel for the commission frankly admitted in their argument that if the commission was in error and section 301 permitted or required such segregation, then the proposed tariff filed by the borough with respect to the rates for customers outside the borough was entirely proper, fair and reasonable.
We think the case is ruled in favor of the borough by a proper application to the facts here present of the principles so clearly set forth by Mr. Justice KEPHART, now the Chief Justice, in the case of Shirk v. City of Lancaster, 313 Pa. 158,169 A. 557 (1933).
The Shirk case was concerned with a bill in equity filed in the court of common pleas by a citizen and taxpayer of the City of Lancaster, a third class city, to enjoin the imposition and collection of water rates established by a city ordinance with respect to water furnished residents of the City by the municipal water plant. The city water supply was obtained from the Conestoga River, outside the city limits, and pumped *Page 56 
to reservoirs and stand pipes within the city, from which it was distributed by gravity throughout the city and also to consumers outside the city, in Lancaster and Manheim Townships. The ordinance fixed a schedule of rates for consumers within the city, and a different and considerably higher rate for consumers outside the city. The opinion of the present Chief Justice laid down, inter alia, the following principles:
(1) A municipally owned water plant, in the matter of rates, and their regulation, is controlled by the courts under the Act of June 16, 1836, P.L. 784, 790, section 13, and not by the Public Service Commission or Public Utility Commission (p. 166).
(2) But in supplying water to corporations and individuals outside the city, the applicable rates [charged by third class cities] are subject to the jurisdiction of the Public Utility Commission,[3] though prescribed by ordinance; and the law requires the fair value standard to sustain such charges (pp. 169, 170).
(3) A municipal water plant cannot be prohibited by either the legislature or the courts from making a fair return by way of profit on the furnishing of its water (p. 167).
(4) The determination of the fair value of a municipal water system, whether by the courts as respects service within the city, or by the commission as respects service outside its limits, must be made in the same manner as that of privately owned utility corporations (p. 170).
(5) In fixing the fair value of the plant for the purpose of determining the just and reasonable rates chargeable by the city for water furnished within its limits, the value of the plant allocated to service outside *Page 57 
the city must be ascertained and deducted from the value of the entire property (p. 170).
(6) Coincidently with determining the fair value of the property, the cost of operating the plant must be ascertained. This includes all charges or expenses involved in the production, supply and distribution of the water; the salaries or wages of all persons directly employed about the system and a just portion of the salaries of elective officers whose time is partly devoted to the business; telephone, insurance, printing, stationery, etc., expenses connected with supply and distribution must be included; all taxes, whether on the plant as such or on bonds that may be properly allocated as an indebtedness against the plant should be allowed for; a depreciation charge should also be provided for. When this figure is ascertained in a given sum, a proportionate part of these expenses must be allocated to the business of service outside the city and the balance must be provided for by rates within the city (p. 171).
(7) The city may charge more for water outside than within its limits — see note 7, p. 166, citing Youngman v. Erie WaterCommrs., 267 Pa. 490, 110 A. 174. This is due to the principle that the citizens and taxpayers of the municipality cannot be made to pay more than a just and reasonable rate based on a fair return on the present fair value of the property used and useful devoted to the public service within the city; and should not be asked to bear any part of the additional expense incurred in supplying water to consumers outside the city; but such additional expense is properly chargeable to the consumers outside the city; thus differentiating in this respect between municipal corporations and privately owned utility corporations, to the advantage of consumers within the limits of the municipality and against those without.
It follows from these principles that a municipality may discriminate between its consumers within its *Page 58 
limits and those without; that while it is entitled to charge rates that will return a fair profit based on the present fair value of all its property used and useful in the public service, it may forego such profit as respects its consumers within its limits and demand it of its consumers outside its limits; that in arriving at the fair value of its property for the purpose of fixing just and reasonable rates to its consumers within the city, the value of the property outside the city or borough must be segregated and deducted from the value of the entire plant, and the value of the property within the city thus be ascertained in fixing the fair and reasonable rates to be charged for water within city limits; and that the rates to be charged consumers outside the city must cover a fair return on the property thus devoted to the public service outside city limits plus a fair proportion of the value, cost and expense of the plant within the city; and that no part of the burden of furnishing water to consumers outside the city can properly be placed on its citizens and consumers within city limits.
This, in effect, requires a segregation and allocation as between consumers inside and outside the city in order that the courts may determine the fair and reasonable rates which may be charged by the city for water within its limits and a like segregation and allocation in order that the commission may determine the fair and reasonable rates which may be charged by the city for water furnished without its limits.
In view of the special statutory provisions on the subject in this Commonwealth, decisions of courts in other jurisdictions are not of much help to us, and decisions relating to privately owned water companies and other utilities are not applicable.
The legal principles above set forth are not affected by the history of the development of this water plant or the creation of the Borough of Ambridge out of *Page 59 
Harmony Township. When the Public Service Company Act went into effect — January 1, 1914 — the Borough of Ambridge was a duly constituted borough, and the water plant, with its distribution system in the Borough of Ambridge and in parts of Harmony Township, had already been sold and conveyed to the Borough and was a municipally owned and operated water system.
Nor are they affected by the fact that until the filing of the schedule of rates complained against — effective April 1, 1938 — the plant had been operated as a unit and the same rates charged outside the borough as in it. As long as there was a sufficient quantity of water consumed in the township to afford the borough a fair return on the service furnished outside the borough at the rates fixed in the common schedule, there was no occasion for any segregation or allocation between borough and township. But along in 1930 by far the largest consumer of water in the township began to get its chief supply of water from another source, (see Borough of Ambridge v. P.S.C., 108 Pa. Super. 298, 165 A. 47 (1933)) and thereafter it became apparent that the water supplied to consumers in the township, by reason of the small quantity of water then being used in comparison with the quantity which was used before Spang-Chalfant Company secured a different supply, was being furnished at a loss, which the consumers and citizens in the borough were being required to carry. It was with the purpose of remedying this condition that a new and scientifically prepared schedule of rates was filed, under which the rates for water furnished outside the borough were raised sufficiently to relieve the consumers within the borough from making good the losses incurred by furnishing water to consumers outside the borough, and instead a very moderate return or profit — much less than is usually allowed a privately owned utility — is obtained *Page 60 
by the borough on the water furnished consumers in the township.
In view of the findings of the commission and the admissions of its counsel, the net result of the new schedule of rates does not differ in effect from what a court of common pleas, sitting in equity, might have decreed, if a bill in equity had been filed by consumers in the borough to enjoin the imposition and collection of rates which required them to contribute to the payment of losses incurred in furnishing water outside the borough limits.
With this disposition of the case we need not dwell on the annual depreciation charge allowed the borough by the commission in arriving at its decision. We may say however, that a depreciation charge based on the 4% sinking fund method is too small. See Cheltenham Abington Sewerage Co. v. P.S.C., 122 Pa. Super. 252,271-274, 186 A. 149. A single small borough does not have the opportunity to invest small sums at 4% interest compounded. A 2% rate would be nearer reality.
The order of the commission is reversed and the complaint is dismissed, at the costs of the complainants, the intervening appellees.
[1] This was amended by Act of March 21, 1939, P.L. 10, so as to provide: "That only public utility service being furnished or rendered by a municipal corporation, or by the operating agenciesof any municipal corporation, beyond its corporate limits shall be subject to regulation and control by the commission as to rates, with the same force and in like manner, as if such service were rendered by a public utility." In view of the want of such power in the commission under the old Public Service Company Law, we do not view this amendment as a change in the law, but merely as making clearer the intention of the Legislature as to the limitation of authority granted the commission with respect to the regulation, etc. of the rates for public service furnished by municipal corporations beyond their limits by section 301 aforesaid.
[2] It cannot give undue or unreasonable preference to, or make unfair discrimination among customers outside its limits, any more than a private corporation similarly situated: Reigle v.Smith, 287 Pa. 30, 35, 134 A. 380; Barnes Laundry Co. v.Pittsburgh, 266 Pa. 24, 41, 109 A. 535.
[3] This was evidently based on the provisions of the Act of March 23, 1925, P.L. 64, relating to third class cities, repealed by, but re-enacted in, the Act of June 23, 1931, P.L. 932 — see sections 3530, 3531, 3532.