## Rohrer et al., Supervisors, v. City of Lancaster

*Louis S. May* and *Windolph & Mueller*, for plaintiffs.
*B. M. Zimmerman*, for defendant.

SCHAEFFER, J., April 12, 1940.—This is a bill in equity for a mandatory injunction to compel the City of Lancaster to reconnect the sewerage system of Lancaster Township with the sewerage system of the City of Lancaster for the disposal of township sewage by the city plant.

The pleadings consist of plaintiffs' bill in equity and the answer filed by defendant.

### Findings of fact

1. The Township of Lancaster is the owner of a certain sewerage system consisting of trunk lines and laterals serving a territory in the western part of said township bounded on the west by President Avenue and the Little Conestoga Creek, on the east by the city line, on the north by Marietta Avenue, and on the south by Seventh Street.

2. The City of Lancaster, defendant, owns and operates a certain sewerage system partly within and partly without the corporate limits of the City of Lancaster, and, in connection with said system, operates two disposal plants for the treatment and disposal of raw sewage, both of which are outside the limits of the city.

3. As a part of its sewerage system, defendant has erected and now maintains a certain pumping station known as Maple Grove Pumping Station, which is situated in the Township of Lancaster.

4. On October 11, 1938, plaintiffs, Willis Rohrer, Christian H. Brubaker, and Frank H. Feagley, Supervisors of the Township of Lancaster, connected the sewerage system of said township with the sewerage system of the City of Lancaster at the Maple Grove Pumping Station.

5. By reason of said connection raw sewage from the said section of the Township of Lancaster was discharged into the sewerage system belonging to the City of Lancaster and was treated and disposed of by the city from October 11, 1938, until July 10, 1939.

6. Said connection was made pursuant to the following letter dated April 21, 1938, from the City of Lancaster to the Supervisors of Lancaster Township: "Board of Supervisors, Lancaster Township, Lancaster, Pa. Attention: Mr. Frank H. Feagley, 1176 Maple Avenue. Gentlemen: Replying to your recent letter concerning the charge to be made by the city for disposal of sewage, we have no definite information at the present time concerning the

amount to be charged but as the Department of Health seems very eager for you to make this connection, it will be satisfactory for you to make it at any time and the question of charges will be settled later. Yours very truly, J. Haines Shertzer, City Engineer."

7. On July 29, 1938, the Supervisors of Lancaster Township agreed "to pay the charges to be agreed upon by the City of Lancaster and the Township of Lancaster", as per the following letter: "The City of Lancaster, Lancaster, Pa., Att: J. A. Taylor, Comm. Dear Sir: At our regular monthly meeting on July 6, 1938, the Board of Supervisors of Lancaster Township unanimously agreed to make the connection to the City of Lancaster's well as requested by the Pennsylvania Department of Health for the disposal of Lancaster Township's sewage, and to pay the charges to be agreed upon by the City of Lancaster and the Township of Lancaster. Very truly yours, Frank H. Feagley, Secy."

8. For about nine months after said connection, negotiations continued between the Township of Lancaster and the City of Lancaster relative to the charge for sewage disposal or compensation for the use of sewerage facilities. Proposed agreements were prepared and submitted, but the parties failed to reach a mutual agreement.

9. On July 10, 1939, the City of Lancaster disconnected and severed the connection between the sewerage system of the Township of Lancaster and the sewerage system of the City of Lancaster at the Maple Grove Pumping Station. This was done after prior notice from the city to the supervisors "that unless a proper contract was entered into, the connection would be severed by the city."

10. Since July 10, 1939, raw sewage from the portion of Lancaster Township referred to flows into and contaminates the Little Conestoga Creek in said township.

## Discussion

The question involved in this proceeding is not one of rate, service, or extension. It does not relate to a transac-

tion between a municipality and a public utility, but it is a controversy arising between two municipalities, the City of Lancaster and the Township of Lancaster.

The first question is that of jurisdiction. Under The Public Service Company Law of July 26, 1913, P. L. 1374, municipal corporations are not subject to the jurisdiction of the Public Service Commission beyond the "limited extent" as provided for in certain parts of the act. These parts are referred to in detail in Barnes Laundry Co. v. Pittsburgh et al., 266 Pa. 24, 31, 32. The Public Utility Law of May 28, 1937, P. L. 1053, repealed the former act but the jurisdiction of the commission was again limited as to "municipalities engaging in public utility business."

Article I, sec. 2, defines the words "public utility" to include any corporation "owning or operating . . . equipment, or facilities . . . for Sewage collection, treatment, or disposal for the public for compensation", and the words "municipal corporation" to include "cities" and "townships"; but provides that the word "corporations . . . shall not include municipal corporations, except as otherwise expressly provided" in the act.

The following sections refer to or mention municipalities:

Section 202(e) requires the approval of the commission, evidenced by a certificate of public convenience, for any public utility to acquire from or transfer to a municipal corporation the title to or the possession or use of any tangible or intangible property.

Section 202(g) requires a like approval "For any municipal corporation to acquire, construct, or begin to operate, any plant, equipment, or other facilities for the rendering or furnishing to the public of any public utility service beyond its corporate limits."

Section 301 provides that "any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits, shall be subject to regulation and control by the commission as to rates".

Section 401 contains a similar provision as to "service" and "extensions".

Section 508 provides that certain sections of article V, relating to accounting and budgetary matters, "shall apply to any municipal corporation rendering or furnishing to the public any public utility service."

Section 903 includes municipal corporations in the provisions of the act relating to enforcement.

Section 911 requires the filing with the commission of any contract or agreement between a public utility and a municipal corporation.

Section 920 confers on the commission the power to vary, reform or revise certain contracts between a public utility and a municipal corporation.

The Public Utility Law of 1937, supra, sec. 2, defines "Service" as follows:

" 'Service' is used in this act in its broadest and most inclusive sense, and includes any and all acts done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities, or contract carriers by motor vehicle, in the performance of their duties under this act to their patrons, employes, other public utilities, and the public, as well as the interchange of facilities between two or more of them."

The Public Utility Law was amended by the Act of March 21, 1939, P. L. 10, inter alia, as follows:

" 'Facilities' means all the plant and equipment of a public utility, including all tangible and intangible real and personal property without limitation, and any and all means and instrumentalities in any manner owned, operated, leased, licensed, used, controlled, furnished, or supplied for, by, or in connection with, the business of any public utility: Provided, however, That no property owned by the Commonwealth of Pennsylvania, or any municipal corporation thereof, at the date when this act becomes effective shall be subject to the commission or to any of

the terms of this act, except as elsewhere expressly provided herein."

It is evident that the Public Utility Law does not apply to municipal corporations except to the limited extent therein expressly set forth. The question involved in this equity proceeding is not within the purview of the Public Utility Law, and, accordingly, the court concludes that it has jurisdiction of the instant case.

In Ambridge Borough v. Pennsylvania Public Utility Comm., 137 Pa. Superior Ct. 50 (1939), Keller, P. J., in his opinion said (p. 53):

"The Public Service Company Act of 1913, P. L. 1374, gave the Public Service Commission no power of supervision or regulation over the rates charged by a municipal corporation which furnished water or other public service to its inhabitants or to customers residing outside its limits. But the Public Utility Law of May 28, 1937, P. L. 1053, in section 301, 66 PS Supp. sec. 1141, provides: 'That any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits, shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service [that is, the service beyond its corporate limits] were rendered by a public utility.'"

It was held that the amendment of March 21, 1939, P. L. 10, does not change the law, but merely clarifies the intention of the legislature as to the limited authority of the commission with respect to the regulation of such rates furnished by municipal corporations beyond their limits. The instant case, as hereinbefore stated, raises no question as to rates.

The negotiations between the City of Lancaster and the Township of Lancaster cannot be construed as a contract. An agreement was to be entered into between the parties, but their minds failed to meet. On October 11, 1938, the township was permitted by the city to connect the sewerage system, owned by the township, with the city's

sewerage trunk-line at a well of the city's pumping station at Maple Grove, south of the Columbia Pike. On July 10, 1939, after notice, the city disconnected the same because of the failure to reach an agreement and the sewage of Lancaster Township is emptied into the Little Conestoga Creek in said township, thereby creating a public health problem which the State Department of Public Health is seeking to abate. The court in this case is not asked to prescribe the terms of any agreement, but plaintiffs are asking the court to restore a status quo which was created originally by mutual consent. In the absence of a contract, intended but never entered into, the arrangement between the city and the township was in the nature of a license.

In Bethlehem v. Allentown, 275 Pa. 110, a controversy arose between two municipalities relative to supplying water in certain territory. Mr. Chief Justice Moschzisker in his opinion at page 116 said:

"Since the litigation involves public interests . . . we venture to suggest that, for the sake of the public, which the parties represent, they should make every effort to arrive at a fair understanding and adjustment, so this controversy may be brought to a speedy close . . . those representing the several communities should make every reasonable endeavor to reach a fair adjustment in their own way."

In the instant case, both parties have the same objective in view and a mutual agreement as to the charge for sewage treatment and disposal or other satisfactory arrangement should be entered into by them in the interest of public health and welfare.

The court is not unmindful of the provisions of article II of the Act of June 22, 1937, P. L. 1987, relating to a municipality permitting a discharge of sewage into a stream. The court has also taken into consideration the Act of May 14, 1937, P. L. 630, sec. 1, being an amendment to the Act of July 18, 1935, P. L. 1286, which provides, inter alia: ". . . whenever any city, borough, in-

corporated town, or township shall singly or jointly with other municipalities or townships, or both, enter into any contract with any authority established in accordance with law or with any private corporation for the furnishing of sewer or sewage treatment services, or both, for its or their benefit and the benefit of the inhabitants thereof, such city, borough, incorporated town, or township may provide by ordinance or resolution, enacted either before or after the acquisition or construction thereof, or the entry into such contract, for the imposition and collection of an annual rental or charge for the use of such sewer, sewage system, or sewage treatment works from the owners of the property served or to be served by it, whether such property is located within or without the corporate limits of such city, borough, town, or township."

Section 2 of the act sets forth what may constitute such annual rental or charge and provides, inter alia, that "The said annual rental or whatever charge shall be de-decided upon by the city, borough, incorporated town, or township shall be apportioned equitably among the properties served by the said sewer, sewage system, or sewage treatment works."

It is not mandatory on the city to furnish this sewage disposal service, although the city appears willing to do so. As between the city and the township, the city cannot be expected to furnish gratis sewage treatment or disposal, if it is a question of charge or rental for disposal of township sewage. On the other hand, the township supervisors have a right to object to charges or conditions which they consider unjust. If the city should deal directly with the property owners who want sewer connections, then the question of rates and rules and regulations can be determined as provided by law. The use of the township's sewerage system is necessary under any arrangement and the township appears willing to permit such use. For nine months the township used the pumping station at Maple Grove and the disposal plant of the city without paying compensation to the city. It is not

equitable for the court to create a similar situation, and the present status of this controversy does not warrant the court in granting a mandatory injunction for the purpose set forth in plaintiffs' bill in equity.

### Conclusions of law

1. The court has jurisdiction of the instant case.

2. Plaintiffs are not entitled to the relief prayed for under the particular facts and circumstances of this case.

### Decree nisi

And now, April 12, 1940, it is ordered, adjudged, and decreed as follows:

1. That plaintiffs' bill in equity be dismissed.

2. That the costs of this proceeding shall be paid by plaintiffs.