## In re Municipal Authorities

MORGAN, Deputy Attorney General, December 3, 1941.—This department is in receipt of your request to be advised regarding certain matters relating to the administration of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1101 et seq. You have submitted three questions for our consideration which will be stated and answered seriatim:

"1. Whether or not the furnishing of water service by an 'Authority' organized under the Municipal Authorities Act of 1935, P. L. 463, as amended, beyond the 'corporate limits' of the municipality organizing the 'Authority' constitutes the furnishing of service

beyond the 'corporate limits' of the 'Authority' and, therefore, subject[s] [the Authority] to the jurisdiction of the Public Utility Commission as to rates and service?"

We have examined the reported decisions of the several courts of this Commonwealth and, so far as we can ascertain, the extent of the Pennsylvania Public Utility Commission's jurisdiction, if any, over authorities created pursuant to the provisions of the Municipality Authorities Act, the Act of June 28, 1935, P. L. 463, 53 PS §2900 (*f*) et seq., has never been considered therein. Lacking such judicial construction, therefore, it becomes necessary to examine the two statutes involved and endeavor to determine the fundamental intention of the legislature with respect to the question at issue.

Municipal corporations, with legislative sanction, for many years have been engaged in furnishing certain service, such as lighting, water supply, etc., not only to their inhabitants but to patrons residing outside their corporate limits. The Public Service Company Law of July 26, 1913, P. L. 1374, gave the Public Service Commission no power of supervision or regulation over the rates charged by such municipalities for service rendered either within or without their corporate limits: Shirk v. Lancaster City, 313 Pa. 158 (1933) ; Ambridge Borough v. Pennsylvania Public Utility Com., 137 Pa. Superior Ct. 50 (1939). The reasonableness of such rates was for the courts. The situation was changed, however, by the enactment of the Public Utility Law of 1937, supra. Section 301 thereof, as amended by the Act of March 21, 1939, P. L. 10, 66 PS §1141, provides:

"Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission: Provided, That only public utility service being furnished or

rendered by a municipal corporation, or by the operating agencies of any municipal corporation, beyond its corporate limits, shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service were rendered by a public utility."

And section 401 thereof (66 PS §1171) provides in part:

". . . Any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits shall be subject to regulation and control by the commission as to service and extensions, with the same force and in like manner as if such service were rendered by a public utility."

The provisions of the foregoing sections of the Public Utility Law are clear and, since the enactment thereof, there can be no question that the rates and service of a municipal corporation rendering public utility service beyond its corporate limits are subject to regulation and control by the Pennsylvania Public Utility Commission: Ambridge Borough v. Pennsylvania Public Utility Com., supra.

However obvious the intention of the legislature thus to subject such rates and service to regulation by the commission, the situation becomes at the same time complex because of the inclusion of the following definitions in the Public Utility Law, sec. 2, 66 PS §1102:

"(15) 'Municipal Corporation' means all cities, boroughs, towns, townships, or counties of this Commonwealth, and also any public corporation, authority, or body whatsoever created or organized under any law of this Commonwealth for the purpose of rendering any service similar to that of a public utility. . . .

"(17) 'Public Utility' means persons or corporations now or hereafter owning or operating in this Commonwealth equipment, or facilities for . . .

"(b) Diverting, developing, pumping, impounding, distributing, or furnishing water to or for the public for compensation . . ."

An authority, as the term is used in the above definition, manifestly includes a "body corporate and politic" organized pursuant to the provisions of the Municipality Authorities Act, supra, sec. 4, 53 PS §2900(*i*), for the purpose of furnishing water to or for the public for compensation.[1] The first question you have propounded arises in consequence for, as applied to municipal authorities, the words "corporate limits" can conceivably refer only to the boundaries of the municipal corporation which creates an authority or the territorial limits of the project acquired and operated by an authority. The former meaning here must prevail for several reasons.

Section 2 of the Public Utility Law includes an authority in its definition of the term "municipal corporation" but does not define the word. It is, however, defined in section 2 of the Municipality Authorities Act, 53 PS §2900(*g*), as "a body politic and corporate created pursuant to this act". The Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §533, provides:

"Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; . . ."

This rule is only a legislative expression of a long-established precept of statutory construction and here

---

[1] Municipal authorities are an innovation in the field of municipal law, the first legislation authorizing their creation (restricted to counties of the second class) being the Act of December 27, 1933, P. L. 114. This act was supplemented by the Municipality Authorities Act and under existing law it is possible for all municipal corporations of the Commonwealth, as that term is defined in section 2 of the act, acting separately or jointly, to organize a body politic and corporate for the purpose of acquiring, holding, constructing, improving, maintaining, operating, owning, and leasing any of the numerous "projects" set out in section 4 of the act (53 PS §2900(*i*)). Upon being brought into existence they become public corporations invested by the legislature with the right to perform certain municipal functions; that such activities are distinctly proprietary, as opposed to governmental, is of no consequence: Lighton et al. v. Abington Township et al., 336 Pa. 345 (1939).

applied means merely that the legislature in using the words "body politic and corporate" intended to ascribe to them their usual and ordinary meaning, viz, a group or association of citizens with certain rights and privileges belonging to them by law in their aggregative capacity, organized for the purpose of exercising governmental functions: Uricich v. Kolesar, 54 Ohio App. 309, 7 N. E. (2d) 413 (1936) ; Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. The group or association of citizens in the instant case are, of course, the citizens of any given municipality who, acting in their aggregative capacity through the municipal officers, create an authority for the purpose of exercising governmental functions pursuant to the provisions of the Municipality Authorities Act. The authority being the body of citizens of a municipal corporation who, through the corporate officers, created it, the "corporate limits" of the authority necessarily must be coterminous with those of the parent municipality.

Furthermore, as hereinbefore discussed, prior to the creation of the Pennsylvania Public Utility Commission, the Public Service Commission, its predecessor, had no power of regulation or supervision over the rates or service of a municipal corporation rendering public utility service. The reason this situation was remedied by the legislature when it enacted the Public Utility Law is obvious. For years patrons residing outside the corporate limits of a municipality furnishing public utility service were without redress, should exorbitant rates be charged, except to resort to litigation—too often lengthy and expensive. The residents of the municipality had, of course, in addition, that potent measure of control afforded by the ballot. Unquestionably the provisions of sections 301 and 401 of the Public Utility Law, clear and definite as they are, represent the deliberate effort of the legislature to remedy an inequitable situation and to prevent the exercise of the rate-making power by public officials not subject to the control of the electorate.

The same reasoning applies with equal force to an authority rendering public utility service beyond the limits of the parent municipality. True, such an authority is a separate business enterprise, but the board, the corporate officers thereof, who fix rates and charges and generally manage and control the project, are citizens of, are appointed by the governing body of, the parent municipality and thus subject to the control of the electorate thereof—a privilege and protection not accorded those citizens residing outside the limits of the creating municipality: section 7, 53 PS §2900(*l*). The need of the latter group for the protection afforded by the aforesaid provisions of the Public Utility Law is neither greater nor less whether the project is being operated by a municipality or by its creature, an authority. The intention of the legislature to confer upon the Pennsylvania Public Utility Commission the power to supervise and regulate service rendered by a municipal corporation beyond its corporate limits is so plain that we cannot conceive that it meant to exclude from that regulation and supervision a municipality doing a public utility business under the guise of an authority.

We have no difficulty in concluding, therefore, that an authority, as the term is used in the Public Utility Law, means the entity, not the project acquired and operated by that entity, and that the Pennsylvania Public Utility Commission has jurisdiction over the rates and service of an authority rendering public utility service outside the corporate limits of the parent municipality or municipalities.

"2. Whether or not a municipality organizing an 'Authority' under the Municipal Authorities Act of 1935, P. L. 463, may undertake the projects provided for in the Municipal Authorities Act in any part of the Commonwealth, and if not, what are the territorial limits of the projects which a municipality may undertake by an 'Authority' organized by it?"

The Municipality Authorities Act, sec. 3, 53 PS §2900 (*h*), requires a municipality desiring to create an authority to file with the Secretary of the Commonwealth articles of incorporation setting forth, inter alia, the name of the authority, that it is to be formed under the said act, that no other authority has been created by the municipality, the name of the incorporating municipality or municipalities and the names, addresses and terms of office of the first members of the board. If the Secretary of the Commonwealth finds the articles to be in proper form, that there has been compliance with the provisions of the act requiring the publication of notice, and that the proper fees have been paid, they are approved, filed and a certificate of incorporation is issued.

It will be noted that the articles of incorporation need not set out the purpose for which the authority is formed; and, in fact, the certificate of incorporation fixes no territorial limits or boundaries of the authority. It merely empowers the authority to acquire, construct, operate, etc., any of the projects enumerated in section 4 of the act.

Prior to the amendment to section 9 of the Act of May 17, 1939, P. L. 167, 53 PS §2900 (*n*), there was, therefore, no specific limitation or inhibition in the act regarding the situs of projects to be undertaken by an authority and it might have been argued that, as originally passed, the act authorized the construction or acquisition of a project in a part of the Commonwealth far removed from the parent municipality. This situation, however, we believe was clarified by the Act of May 17, 1939, P. L. 167, supra, which added to section 9 of the act the following:

"This section, without reference to any other law, shall be deemed complete for the acquisition, by agreement, of projects, as defined in this act, located wholly within or partially without the municipality or municipalities causing such Authority to be incorporated,

any provisions of other laws to the contrary notwithstanding; and no proceedings or other action shall be required except as herein prescribed."

The meaning of the words "wholly within or partially without" is clear and by their use it is obvious that the legislature intended specifically to impose territorial limits as to existing facilities which may be acquired by an authority and operated as a project; some part of each project must be located within the incorporating municipality although the remainder may be situate without its corporate limits. For example, an authority may acquire a water supply system serving several townships or even counties providing some part of that system serves the inhabitants of the municipality causing the creation of the authority.

While it is true that the above limitation is imposed specifically only as to existing facilities which may be acquired by an authority, and not to original construction, we are of the opinion that the legislature never intended to authorize the formation of authorities for the purpose of acquiring and operating projects indiscriminately in any part of the Commonwealth in competition with other legitimate business enterprise. The result sought to be accomplished by any statute must always be considered when that law is construed and interpreted. Clearly the legislature, in enacting the Municipality Authorities Act, intended only to enable municipal corporations to acquire and operate projects situate in and near the parent municipality; and that would, primarily, directly benefit and serve the citizens of that municipality even though the operation thereof might incidentally inure to the benefit of the residents of surrounding territory.

"3. Where the commission has a rate case pending against a public utility furnishing water service and possible refunds may be due to consumers, does the rate case abate or terminate at the time the utility transfers its property to an 'Authority'? If the rate pro-

ceeding does not abate, does the proceeding continue against the utility or the 'Authority', and how shall the payment of refunds be enforced?"[2]

Although the precise questions here involved have not heretofore been passed upon by the courts of this Commonwealth, an examination of available authority leads us to conclude that a transfer by a public utility of its facilities and other property to an authority during the pendency of a rate case will not render moot such proceeding. In Groesbeck et al. v. Duluth, South Shore & Atlantic Ry. Co., 250 U. S. 607 (1919), the Michigan legislature in 1907, pursuant to constitutional authority, fixed a rate of two cents a mile as the maximum intrastate passenger fare on railroads operating in the lower peninsula and three cents a mile for those in the upper peninsula in the State of Michigan. By Act 276, approved May 2, 1911 (Michigan Laws), the two-cent rate was made applicable to all the railroads of the State whose gross earnings on passenger trains equaled or exceeded $1,200 per mile of line operated. Before the statute took effect, the Duluth, South Shore & Atlantic Railway Company, an interstate carrier operating in the upper peninsula, brought suit in the District Court of the United States for the Eastern District of Michigan to enjoin the enforcement of the act. The bill alleged that the reduced rate would deprive plaintiff of

---

[2] Section 313 of the Public Utility Law, 66 PS §1153, provides in part as follows:

"(a) If, in any proceeding involving rates, the commission shall determine that any rate received by a public utility was unjust or unreasonable, or was in violation of any regulation or order of the commission, or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the commission shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection, within two years prior to the date of the filing of the complaint, together with interest at the legal rate from the date of each such excessive payment. . . .

"(b) If the public utility fails to make refunds within the time for payment fixed by any final order of the commission, or any appellate court, . . . any patron entitled to any refund may sue therefor in any court of common pleas of this Commonwealth . . ."

its property without due process of law in violation of the Fourteenth Amendment. The Attorney General and the Railroad Commissioners of the State, being charged by the law with its enforcement, were made defendants. They denied that the rate was confiscatory; and on this issue the district court found for the railway. A final decree granting the relief sought was filed February 14, 1918, and an appeal to the Supreme Court of the United States was allowed. Meanwhile, on January 1, 1918, the Federal Government had taken over the operation of the railroads. The two-cent rate was never put into effect on this railroad, as a restraining order issued upon the filing of the bill was continued until entry of the final decree. In 1919 the statute attacked was repealed (Act 382, August 14, 1919, p. 669, Michigan Laws).

The Supreme Court of the United States, in holding that the case had not become moot, said (p. 609) :

"On continuing the restraining order the Railway was required to issue to all intrastate passengers receipts by which it agreed to refund, if the act should be held valid, the amount paid in excess of a two-cent fare. Later the Railway was required to deposit, subject to the order of the court, such amounts thereafter collected. The fund now on deposit exceeds $800,000, and the refund coupons are still outstanding. In order to determine the rights of coupon holders and to dispose of this fund it is necessary to decide whether the Act of 1911 was, as respects this railroad, confiscatory."

In Glens Falls Portland Cement Co. v. Delaware & Hudson Co. et al., 55 F.(2d) 971 (1932), an action was brought to enforce a reparation order dated August 14, 1930, of the Interstate Commerce Commission allowing a recovery to the Glens Falls Portland Cement Company in the sum of $12,588.63 with interest, against the Delaware & Hudson Company, the New York, New Haven & Hartford Railroad Company, and

the New York, Ontario & Western Railway Company.

The basis of the reparation order was that within the period of two years antecedent to plaintiff's application to the commission for relief the three railroads against which the order was aimed charged plaintiff unjust and unreasonable rates on shipments of cement moving over their lines from Glens Falls, New York, to New England destinations.

The complaint had been filed on August 27, 1926. The reparation order of the commission did not issue until August 14, 1930. While the complaint was pending, to wit, on November 14, 1929, the Delaware & Hudson Company filed with the commission an application in which leave was sought by the company to transfer all its railroad property to a new corporation formed for the purpose of taking over these properties. The commission granted the application on January 16, 1930, permitting abandonment effective as of April 1, 1930. The Delaware & Hudson Company set up as a defense in the reparation proceeding that by reason of the order of the commission which permitted it to abandon operations effective April 1, 1930, and allowed it to transfer all its property and operations to another corporation, it ceased on that date to be engaged in interstate commerce as a carrier, became a private company, and was no longer subject to any power over carriers conferred by Congress upon the commission; and that, therefore, the reparation order which was entered subsequent to this change of status was wholly ineffectual and void as against it.

The court, at pages 980 and 981, said:

"I am told that this raises an entirely novel point, and it may well be so, for I fancy that instances are rare where a corporation, which is a solvent going concern under the jurisdiction of the Commission, is allowed to transfer its carrier properties to another corporation, and thus put itself outside of the ambit of the Commission's administrative powers.

"It is common ground between the parties, of course, that after this change of status on April 1, 1930, the Commission would have been powerless to have issued any regulatory orders against the D. & H., and, of course, thereafter there could not have arisen any basis for any reparation orders against it because it was no longer a carrier, and the question of reasonable rates would be entirely foreign to it.

"But here we have a case where a proceeding was pending against the D. & H. at the time when its status was changed. It had been represented on this hearing by counsel, of whom one represents it here, and therefore it had knowledge of the hearing and of the report of the Commission which was rendered thereon almost a year before the certificate of convenience was allowed to it.

"The situation of the D. & H. at the time when it thus changed its status was, it seems to me, juridically analogous to that of a defendant against whom an interlocutory decree had been rendered involving injunctive relief and incidental damages for past torts which remained to be proved.

"Analogies are not far to seek. If a suit in equity had been brought in this court—say for unfair competition—in which the jurisdiction over the subject-matter was based on diversity of citizenship and the amount involved in the controversy, and in that suit an interlocutory decree had been granted to the plaintiff providing for an injunction and for an accounting, the jurisdiction of this court could not have been ousted by the defendants becoming citizens of the same state as the plaintiff after that decree, or by a voluntary reduction on the part of the plaintiff of the amount claimed, or by change of any other circumstance on which subject-matter jurisdiction once acquired was based. Kirby v. American Soda Fountain Co., 194 U. S. 141, 145, 146, 24 S. Ct. 619, 48 L. Ed. 911; Louisville, etc., Ry. Co. v. Louisville Trust Co., 174 U. S. 552, 566, 19 S. Ct.

817, 43 L. Ed. 1081; Koenigsberger v. Richmond Silver Mining Co., 158 U. S. 41, 49, 50, 15 S. Ct. 751, 39 L. Ed. 889; Clarke v. Mathewson, 12 Pet. 164, 9 L. Ed. 1041; Morgan's Heirs v. Morgan et al., 2 Wheat. 290, 297, 4 L. Ed. 242; Lebensberger v. Scofield, 139 F. 380, 384 (C. C. A. 6); Ex parte Kyle (D. C.) 67 F. 306, 309; Hatfield v. Bushnell, 1 Blatchf. 393, 11 Fed. Cas. 814, 815, No. 6211.

"Similarly if, in a case where suit on a patent had been brought in this court, the patent on which the court's subject-matter jurisdiction was based should expire during the pendency of the suit, of course an injunction in such a case would not be granted; but the court would not lose jurisdiction and could continue the suit for the accounting incidental to past torts involved in trespasses by infringement. Beedle v. Bennet, 122 U. S. 71, 75, 7 S. Ct. 1090, 30 L. Ed. 1074. . . .

"I hold, therefore, that the reparation order must have the same juridical status against the D. & H. in this case as against the other two defendants who are still, as carriers, within the jurisdiction of the Commission. In other words, the D. & H. retired to private life cum onere of these past misdeeds."

See also Abilene & Southern Ry. Co. et al. v. Terrell et al. (Ct. of Civ. App., Tex., 1939), 131 S. W. (2d) 37, and Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433 (1910).

Although neither of the cases cited was decided by the courts of this Commonwealth, nor did they concern the laws thereof, we believe that their application to the question at issue is clear and the legal principles therein enunciated are sound. Consequently, as hereinbefore indicated, we are of the opinion that a transfer of the facilities of a public utility to an authority during the pendency of a rate case which may involve possible refunds to consumers will not abate or terminate the litigation and that the same will continue until the rights of the consumers are finally adjudicated.

In considering the other phase of your final inquiry, one fundamental proposition must be borne in mind, viz, that a patron of a public utility who has been charged an unreasonable rate for the service rendered has a property right in the excess payment which is recognized by, and enforcible under, the common law.

As said by the Superior Court of this Commonwealth in Centre County Lime Co. et al. v. Public Service Commission, 96 Pa. Superior Ct. 590 (1929), at page 602:

"If a shipper has been charged an unreasonable rate he has a property right in the excess payment—a right recognized by, and enforceable under, the common law (Texas and Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U. S. 426)—and we are not prepared to say that the commission has been given the power to take away that right. The manner in which the right may be enforced has been modified by the Public Service Company Law; 'no action shall be brought in any court' to enforce it, 'unless and until' the commission shall have determined that the rates paid were unreasonable, 'and then only to recover such damages as may have been awarded . . . by the commission.' We think this is as far as the statute was intended to go, and that a claimant for reparation is still entitled to his day in some court."

See also Centre County Lime Co. v. Public Service Commission et al. (No. 1), 103 Pa. Superior Ct. 179 (1931).

The case of Merwine v. Mt. Pocono Light & Improvement Co., 304 Pa. 517 (1931), we believe to be decisive of the phase of the question here under discussion. In that case an action for negligence had been brought against the Mt. Pocono Light & Improvement Company prior to a transfer of the franchise and property of the company to the Pennsylvania Power & Light Company, which transfer had the approval of the Public Service Commission.

After the conveyance, the Mt. Pocono Light & Improvement Company filed a suggestion that the property had been conveyed, that defendant had ceased to exist, and that the action should be abated. Plaintiff also in that proceeding sought to substitute the Pennsylvania Power & Light Company, the transferee of the property, as defendant. The trial court denied substitution and abated the action. The Supreme Court in reversing the trial court said the following (p. 522) :

". . . 'According to the old settled common law, upon the civil death of a corporation, . . . all the debts due to and from it [were] totally extinguished [but] the rule of the common law has become obsolete and odious. The sound doctrine now is that the capital and debts of corporations constitute a trust fund for the payment of creditors and stockholders and a court of equity will lay hold of the fund and see that it be duly collected and applied. The death of a corporation no more impairs the obligation of contracts than the death of a private person.' Defendant corporation not having been legally dissolved, its present condition is rather that of an inactive corporation and it is not altogether dead. Before a corporation has ceased to exist in the absolute sense here contended for, it must fully and definitely close its affairs, and the fact that a corporation has 'ceased to do business' does not preclude it from exercising its various rights to accomplish this purpose. . . .

"It is admitted the present plaintiff stands in the position of a creditor of defendant corporation, as she holds a claim which vested before the corporation sold its property. A person having a cause of action capable of adjustment and liquidation upon a trial, is a creditor: . . . It is immaterial whether the cause arose out of contract or tort: . . . In the present case the claim arose out of what plaintiff alleges was negligence of defendant company. Defendant now seeks to avoid liability to plaintiff by selling its property and contend-

ing that, for the purpose of participation in a law suit, it no longer exists. To permit evasion of that character under section 5 of the Act of 1876, which obviously was never intended to work such hardship, would open the door to corporations seeking to evade their obligations to effectively accomplish the purpose by simply transferring their property to other incorporated bodies after suits were begun against them. As we said in B. & S. v. Musselman, 2 Grant 348, 352, where there was an attempt to evade liability by consolidation of two corporations, 'a court of justice would not . . . attribute to the law-making power an intention of enabling [corporations] to discharge their liabilities in such a summary way.' . . .

"Whatever the liability of the Pennsylvania Power & Light Company may or may not prove to be, we pass that point and note that the proper course at the present state of proceedings requires plaintiff first to proceed to judgment against defendant if she can, and, having secured judgment, to levy where defendant's assets liable for the judgment may be found."

It would appear, therefore, that the courts would never permit a public utility to defeat the enforcement of a property right merely by the simple expedient of transferring its facilities to another. The consideration received by the utility, along with other capital, is a trust fund for the payment of creditors and courts of equity will, as indicated in Merwine v. Mt. Pocono Light & Improvement Co., supra, lay hold of that fund and direct its proper application. The patron who has paid an unreasonable rate, acting individually or collectively with others of the same class, is, of course, required to proceed in conformity with the provisions of section 313 of the Public Utility Law, supra, but in a proper case, having brought suit and recovered judgment, his right to collected the amount due is not impaired merely because the judgment debtor is no longer furnishing public utility service.

In view of the foregoing we are of the opinion and you are advised that:

1. The Pennsylvania Public Utility Commission has jurisdiction over the rates and service of an authority organized pursuant to the provisions of the Municipality Authorities Act of June 28, 1935, P. L. 463, 53 PS §2900 (*f*) et seq., rendering public utility service outside the corporate limits of the municipality which causes the creation of such authority.

2. An authority organized pursuant to the provisions of the Municipality Authorities Act of June 28, 1935, P. L. 463, 52 PS §2900 (*f*) et seq., may not acquire and operate the projects provided for in said act in every part of the Commonwealth; some part of each project so acquired and operated must be located within the incorporating municipality although the remainder may be situate without its corporate limits.

3. A transfer of the facilities of a public utility to an authority organized pursuant to the provisions of the Municipality Authorities Act of June 28, 1935, P. L. 463, 52 PS §2900 (*f*) et seq., pending a rate case which may involve possible refunds to consumers will not abate or terminate the litigation and the same will continue against the public utility until the rights of the consumers are finally adjudicated. If in such rate case the Pennsylvania Public Utility Commission determines that the rates in question were unjust or unreasonable, or in violation of any regulation or order of the commission, or in excess of the applicable rate contained in a tariff in effect at the time the litigation was instituted and the public utility fails to make refunds within the time for payment fixed by the final order of the commission, or any appellate court, the consumers to whom the refunds are due may institute suits therefor in any court of common pleas of this Commonwealth and recover, in addition to the amount of the refunds, a penalty of 50 percent of the amount of such refund together with all court costs and reasonable attorney's fees.